## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

DELILAH MORRISON and SHERRI
ARGUELLO, on behalf of themselves and all
others similarly situated,

                 Plaintiffs,

v.

MONEYGRAM INTERNATIONAL, INC.;
PHILIP W. MILNE; DAVID J. PARRIN;
ANTHONY P. RYAN; JESS T. HAY;
LINDA JOHNSON RICE; ALBERT M.
TEPLIN; TIMOTHY R. WALLACE;
MONTE E. FORD; JUDITH K. HOFER;
ROBERT C. KRUEGER; DONALD E.
KIERNAN; DOUGLAS L. ROCK; OTHON
RUIZ MONTEMAYOR; THE
MONEYGRAM INTERNATIONAL, INC.
PENSION AND 401(K) COMMITTEE;
JOHN DOES 1-20,

                 Defendants.

Case No. 08-CV-1121 (PJS/JJG)

ORDER

Thomas J. McKenna, GAINEY & MCKENNA; and Shawn M. Perry, PERRY &
PERRY, PLLP, for plaintiffs.

Stephen P. Lucke, F. Matthew Ralph, Jessica J. Nelson, and Andrew J. Holly,
DORSEY & WHITNEY LLP, for defendants.

Plaintiffs Delilah Morrison and Sherri Arguello invested in a retirement plan ("the Plan")

sponsored by their former employer, defendant MoneyGram International, Inc. ("MoneyGram")

and established pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§ 1001 et seq.  Plaintiffs bring this putative class action against various Plan fiduciaries,

including MoneyGram itself, the MoneyGram International Inc. Pension and 401(k) Committee

("the Committee"), and various named and unnamed corporate officers and directors.  Plaintiffs allege that defendants breached various fiduciary duties, and that those breaches resulted in losses for which defendants are now liable to the Plan under §§ 1109 and 1132(a)(2).[1]  Plaintiffs also seek injunctive and monetary relief for a class of participants and beneficiaries under § 1132(a)(3).

This matter is before the Court on defendants' motion to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Defendants' motion raises a number of difficult legal issues, some of which have divided the federal courts.  For the reasons stated below, the Court grants defendants' motion with respect to Count IV and denies it in all other respects.

## I.  BACKGROUND

### A.  The Plan

MoneyGram is the sponsor and administrator of the Plan, which was established on July 1, 2004 (the first day of the proposed class period).  Am. Compl. ¶¶ 3, 42, 53, 59; Swanson Decl. Ex. B § 1.1 (hereinafter "Plan § ___").  The Plan incorporates a trust agreement ("the Trust") between MoneyGram and the Plan trustee, T. Rowe Price Trust Company.  Am. Compl. ¶ 42; Plan § 1.1; McKenna Decl. Ex. A (hereinafter "Trust § ___").  The Committee is the "named fiduciary" of the Plan within the meaning of § 1102(a).  Plan § 8.1.  All of the individual

---

[1]All citations to ERISA are to Title 29 of the United States Code.

defendants are alleged to be Plan fiduciaries within the meaning of § 1002(21)(A).  In this Order, the Court will sometimes refer to defendants collectively as "MoneyGram."[2]

The Plan is a "defined contribution" or "individual account" plan within the meaning of § 1002(34).  Am. Compl. ¶ 40.  The Plan is funded by contributions from individual participants and from their employer, MoneyGram.  Am. Compl. ¶¶ 41, 48.  The Plan offers several investment funds, including the Employer Stock Fund, which invests solely in MoneyGram stock.  Plan § 7.2(c).  Participants may choose to invest their individual contributions in any fund offered by the Plan, with the exception of the Employer Stock Fund.  That fund is reserved for employer contributions.[3]  Plan § 7.2(c).

MoneyGram has committed to match participants' contributions to the Plan up to a certain level, and MoneyGram may choose to make additional profit-sharing contributions to the Plan.  Am. Compl. ¶ 48; Plan § 4.1.  Until March 14, 2008, when the Employer Stock Fund was closed to additional investments, MoneyGram's matching and profit-sharing contributions were initially invested in the Employer Stock Fund.  Am. Compl. ¶¶ 48, 50; Plan § 7.3(a).  A participant could then transfer the contributions that MoneyGram had made on her behalf to any of the other funds, or she could leave those contributions in the Employer Stock Fund.  Swanson Decl. Ex. C at 17 (hereinafter "SPD at ___").

---

[2]Plaintiffs assert six claims, each of which is brought against every defendant.  The parties have not drawn any distinctions among defendants for purposes of defendants' motion to dismiss.  The Court will follow the parties' lead.

[3]Plaintiffs allege otherwise in ¶ 3 of their Amended Complaint, but they have not explained (or even acknowledged) the clear language to the contrary in the Plan nor disputed MoneyGram's description of the Employer Stock Fund as a "closed" fund.

## B. MoneyGram

MoneyGram is a large company that provides money-transfer and other financial services to customers around the world.  MoneyGram was incorporated in December 2003, and its common stock began trading on the New York Stock Exchange on July 1, 2004.  Am. Compl. ¶¶ 14, 70-71.  MoneyGram is a spinoff of a subsidiary of another company, Viad Corp. ("Viad").  MoneyGram assumed all liabilities for retirement benefits for certain current and former Viad employees.  Am. Compl. ¶¶ 70-71.

According to plaintiffs, MoneyGram's business model is "predicated upon acquiring high interest long-term assets with relatively low interest short-term money."  Am. Compl. ¶ 76.  MoneyGram's goal is to "generate arbitrage income, as measured by the difference between the relatively low interest paid to the short-term commercial paper creditors and the higher interest to be received by MoneyGram on its long-term investments."  Am. Compl. ¶ 76.  Toward that end, MoneyGram invested hundreds of millions of dollars in mortgage-backed securities, Am. Compl. ¶¶ 65, 72 — money that MoneyGram had borrowed by issuing short-term commercial paper, Am. Compl. ¶ 76.

As of June 30, 2004, mortgage-backed securities made up approximately two-thirds of MoneyGram's investment portfolio.  Am. Compl. ¶ 72.  As of the same date, MoneyGram's investment portfolio had suffered nearly $12 million in long-sustained losses — that is, losses of one year or longer in duration.  Am. Compl. ¶ 72.  Under Generally Accepted Accounting Principles ("GAAP"), a company may exclude from the calculation of net income the unrealized losses suffered on an investment in a security if (1) the losses are temporary (or, in accounting

parlance, not "other than temporary"), and (2) the security is "held to maturity," meaning that the company has the intent and ability to hold the security until it matures.  Am. Compl. ¶¶ 73-74.

MoneyGram chose to treat its unrealized losses as temporary and its mortgage-backed securities as "held to maturity" under GAAP.  Am. Compl. ¶ 75.  As a result, MoneyGram excluded those unrealized losses when computing its net income.  Am. Compl. ¶ 75.  Plaintiffs allege that this accounting treatment was improper both because the losses that MoneyGram sustained on the mortgage-backed securities were "other than temporary" and because MoneyGram did not have the ability to hold these assets until maturity.  Am. Compl. ¶ 77.  As a result, plaintiffs allege, MoneyGram materially understated its recognized losses and thereby materially overstated its net income.  Am Compl. ¶ 77.

When a company excludes unrealized losses from the calculation of its net income under GAAP, the company is nevertheless required to calculate and disclose those losses.  Am. Compl. ¶ 73.  Plaintiffs allege that, in addition to materially understating the losses that it should have recognized (i.e., the losses that, under GAAP, should have been reflected in reductions to net income), MoneyGram also materially understated its unrealized losses (i.e., the losses that, under GAAP, were properly ignored when calculating net income).  Am Compl. ¶¶ 87-92.  For example, plaintiffs allege that MoneyGram disclosed $100 million in unrealized losses on certain securities as of November 30, 2007, but when it sold those same securities in January 2008, MoneyGram realized $200 million in losses — double the amount that it had disclosed just a few weeks earlier.  Am. Compl. ¶¶ 90-91.

In late 2007, Euronet Worldwide, Inc. offered to buy MoneyGram for $20 per share (which represented a premium of about 43% over the closing price on the day of the offer).

MoneyGram rejected the offer.  Am. Compl. ¶¶ 78, 137-145.  A short time later, on January 14, 2008, MoneyGram announced that it had completed the valuation of its investment portfolio as of November 30, 2007, and had experienced additional unrealized net losses of $571 million since September 30, 2007, bringing cumulative net unrealized losses to $860 million.  Am. Compl. ¶ 69.  Immediately after this announcement, MoneyGram's stock lost nearly half its value.  Am. Compl. ¶ 69.  In the same press release, MoneyGram announced that it was engaged in negotiations with new investors for a capital infusion; ultimately, these new investors purchased a majority stake in MoneyGram for around $760 million.  Am. Compl. ¶¶ 116, 119.

By March 2008, MoneyGram had lost about $1.6 billion on its investments in mortgage-backed securities, and its stock had lost 92% of its value over the preceding year.  Am. Compl. ¶ 119.  After MoneyGram disclosed these losses, the SEC opened an investigation into MoneyGram's previous financial statements.  Am. Compl. ¶ 119.  As of the date of the filing of the amended complaint, MoneyGram stock — the same stock that Euronet Worldwide was willing to purchase for $20 per share in late 2007 — was trading at under $1.50 per share.  Am. Compl. ¶ 122.

## C.  Fiduciary Communications

Plaintiffs allege that a number of communications made by defendants during the class period were fiduciary communications governed by ERISA.  Those communications include all of MoneyGram's public SEC filings and all of the press releases that were incorporated into those filings.  Plaintiffs allege that these purported fiduciary communications included inaccurate information about MoneyGram's investment portfolio.  Specifically, plaintiffs allege that these purported fiduciary communications inaccurately reported that MoneyGram had the ability to

hold its investments long-term, materially understated MoneyGram's unrealized losses, failed to acknowledge that MoneyGram's losses were "other than temporary," improperly represented that MoneyGram's losses were due to temporary market conditions, and failed to include disclosures that would enable Plan participants to assess the quality of MoneyGram's investment portfolio. Am Compl. ¶ 106.

### D. The Plaintiffs

Both of the named plaintiffs — Morrison and Arguello — "cashed out" of the Plan before the price of MoneyGram stock plummeted in the wake of the January 14, 2008 disclosures about the magnitude of the company's investment losses. Arguello was terminated by MoneyGram in June 2007 and received a full distribution of her Plan account in December 2007. Second Swanson Decl. ¶ 3. At the time Arguello received her distribution, MoneyGram stock was trading at $14.897 per share. Second Swanson Decl. ¶ 3. Morrison left her employment with MoneyGram in mid-October 2007 and received a full distribution of her Plan account about a week later. Swanson Decl. ¶ 3. At the time Morrison received her distribution, MoneyGram stock was trading at $15.8486 per share. Swanson Decl. ¶ 3.

## II. ANALYSIS

### A. Rule 12(b)(1)

Plaintiffs bring their claims under §§ 1132(a)(2) and (3), both of which authorize actions by a "participant" in an ERISA plan. ERISA defines a "participant" as follows:

> The term "participant" means any employee or former employee of
> an employer, or any member or former member of an employee
> organization, who is or may become eligible to receive a benefit of
> any type from an employee benefit plan which covers employees of

> such employer or members of such organization, or whose
> beneficiaries may be eligible to receive any such benefit.

§ 1002(7).  Courts have held that, to be a "participant" in an employee-benefit plan for purposes

of §§ 1132(a)(2) and (3), a plaintiff must have a colorable claim for vested benefits under that

plan.  *Adamson v. Armco, Inc.*, 44 F.3d 650, 654 (8th Cir. 1995).

MoneyGram argues that, because Morrison and Arguello "cashed out" of the Plan, neither

is a "participant" for purposes of §§ 1132(a)(2) and (3), and thus neither has standing to maintain

this action.  MoneyGram therefore moves under Rule 12(b)(1) to dismiss plaintiffs' complaint

for lack of subject-matter jurisdiction.  *Cf. Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th

Cir. 2002) (if a plaintiff lacks standing, the district court has no subject-matter jurisdiction).

This Court and several other federal courts have recently held that the question of whether

a plaintiff is a "participant" in an employee-benefit plan for purposes of §§ 1132(a)(2) and (3)

goes to the merits of an ERISA action and not to the subject-matter jurisdiction of the court.  *See,

e.g.*, *Harzewski v. Guidant Corp.*, 489 F.3d 799, 803-804 (7th Cir. 2007) ("Except in extreme

cases . . . the question whether an ERISA plaintiff is a 'participant' entitled to recover benefits

under [ERISA] should be treated as a question of statutory interpretation fundamental to the

merits of the suit rather than as a question of the plaintiff's right to bring the suit."); *Coan v.

Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) ("Although we have referred to a plaintiff's status as

a 'participant' under ERISA as a question of 'standing,' . . . it is a statutory requirement, not a

constitutional one."); *In re Patterson Cos., Inc. Sec., Derivative & ERISA Litig.*, 479 F. Supp. 2d

1014, 1042 (D. Minn. 2007) ("Defendants challenge plaintiff's status under ERISA and whether

she is the type of individual Congress intended to pursue litigation on behalf of the Patterson

Plan, a challenge qualitatively distinct from a jurisdictional challenge to the court's Article III power to hear a 'case or controversy.'"); *but see Wilson v. Sw. Bell Tel. Co.*, 55 F.3d 399, 403 n.3 (8th Cir. 1995) (stating in dicta that "[t]he argument that appellants lack standing to sue under ERISA [because they are not 'participants'] is a jurisdictional issue that could have been raised in direct response to the appeal").

If these courts are correct, then MoneyGram's argument that plaintiffs are not "participants" should be analyzed under Rule 12(b)(6) (or Rule 56) rather than Rule 12(b)(1). But plaintiffs have not objected to MoneyGram's characterization of this issue as jurisdictional, nor have they objected to the Court's consideration of matters outside the pleadings,[4] nor have they asked the Court to defer ruling on MoneyGram's motion until plaintiffs have had an opportunity to take discovery.  Given that the parties do not dispute any of the facts relevant to the question of whether plaintiffs are "participants" within the meaning of §§ 1132(a)(2) and (3), it simply does not matter whether the Court analyzes this question under Rule 12(b)(1), 12(b)(6),

---

[4]Generally, in ruling on a Rule 12(b)(1) motion,

> "the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction — its very power to hear the case — there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

*Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)).

or 56.  The dispute is purely legal, and the legal question will be answered the same no matter what procedural rule applies.

As noted earlier, the Plan is a "defined contribution" plan within the meaning of § 1002(34).  The Supreme Court recently held that a participant in a defined-contribution plan may bring a breach-of-fiduciary-duty claim under § 1132(a)(2) for alleged losses to the participant's individual account.  *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 128 S. Ct. 1020, 1026 (2008).  On its face, the Court's holding begged the question of who *is* a "participant" in a defined-contribution plan.  In a footnote, however, the Court noted that the defendants had filed a motion to dismiss the writ of certiorari, arguing that the case was moot because the plaintiff had recently cashed out of the plan and therefore was no longer a "participant."  *Id.* at 1026 n.6.  The Court rejected the defendants' argument, explaining that "the case is not moot" because "[a] plan 'participant' . . . may include a former employee with a colorable claim for benefits."  *Id.*  In support of its holding, the Supreme Court cited *Harzewski v. Guidant Corporation*, 489 F.3d 799 (7th Cir. 2007).

In *Harzewski*, the plaintiffs were former employees of Guidant who brought claims under § 1132(a)(2) against various fiduciaries of Guidant's defined-contribution plan.  The plaintiffs contended that the fiduciaries had acted imprudently in failing to dispose of allegedly overvalued Guidant stock that was held in the plan.  *Harzewski*, 489 F.3d at 800, 803.  After filing their initial complaint, but before filing their amended complaint, the plaintiffs had retired from Guidant and cashed out their pension benefits.  *Id.* at 801.  The district court dismissed the plaintiffs' complaint for lack of standing, but the Seventh Circuit reversed, holding that the plaintiffs were "participants" in the plan because they had a claim for "benefits."  *Id.* at 804-05.

-10-

The Seventh Circuit noted that some courts have held, in similar cases, that the recovery

sought by a cashed-out participant in a defined-contribution plan is not a "benefit" but rather

"damages." *Harzewski*, 489 F.3d at 804.  The Seventh Circuit rejected this distinction.  *Id.*

Instead, the Seventh Circuit explained, ERISA authorizes suits for monetary relief to which a

plan participant is entitled by the terms of the plan, and such a suit is a claim for "benefits."  *Id.*

In the case of defined-contribution plans, those "benefits" include money that would have been in

the participant's account but for a fiduciary's breach of his duty.  *Id.*  As the Seventh Circuit

explained:

> Suppose Guidant had stolen half the money in a plan participant's
> retirement account and a suit by the participant resulted in a
> judgment for that amount; the suit would have established the
> retiree's eligibility for the larger benefit.  There is no difference if
> instead of stealing the money from the account, Guidant by
> imprudent management caused the account to be half as valuable
> as it would have been under prudent management.  The benefit in a
> defined-contribution pension plan is, to repeat, just whatever is in
> the retirement account when the employee retires or *whatever*
> *would have been there had the plan honored the employee's*
> *entitlement*, which includes an entitlement to prudent management.

*Id.* at 804-05.  *Cf. Harold Ives Trucking Co. v. Spradley & Coker, Inc.*, 178 F.3d 523, 526-27

(8th Cir. 1999) (noting that an award of damages that compels a defendant to make good to the

plan any losses to the plan resulting from the defendant's breach falls squarely within the plain

meaning of §§ 1132(a)(2) and 1109(a)).

The facts and allegations in this case mirror the facts and allegations in *Harzewski*.  Like

Morrison and Arguello, the plaintiffs in *Harzewski* were former employees who brought claims

under § 1132(a)(2) alleging that the defendants breached their fiduciary duties by retaining

overvalued employer stock in the plan.  Also like Morrison and Arguello, the plaintiffs in

*Harzewski* sought the difference between what they actually received when they cashed out and what they would have received but for the defendants' breaches of their fiduciary duties. True, the *Harzewski* plaintiffs did not cash out of the plan until after their initial complaint was filed, whereas Morrison and Arguello cashed out before filing their initial complaint. But in reversing the district court's dismissal for lack of standing, the Seventh Circuit did not rely on the fact that the plaintiffs had not yet cashed out when they filed their initial complaint. Instead, the Seventh Circuit clearly held that the plaintiffs were "participants" because, even *after* cashing out, they continued to have a claim for vested benefits.

Under *Harzewski*, then, Morrison and Arguello would unquestionably be deemed to be "participants" for purposes of §§ 1132(a)(2) and (3). The fact that, in *LaRue*, the Supreme Court similarly held that a cashed-out plaintiff was a "participant" — and expressly relied on *Harzewski* — would seem to dispose of MoneyGram's contention that Morrison and Arguello lack standing.

MoneyGram argues, though, that *LaRue* did not really hold that former employees who have cashed out of a defined-contribution plan have a colorable claim for benefits. Instead, MoneyGram argues, the Supreme Court's footnote was ambiguous about whether the plaintiff in *LaRue* remained a participant in the plan. Because the Supreme Court did not resolve the issue, MoneyGram argues, this Court is bound to follow the Eighth Circuit's decisions in *Adamson v. Armco, Inc.*, 44 F.3d 650 (8th Cir. 1995) and *Gilquist v. Becklin*, 675 F. Supp. 1168 (D. Minn. 1987), *aff'd*, 871 F.2d 1093 (8th Cir. 1988) (unpublished table decision), which, according to MoneyGram, together establish that cashed-out former employees lack standing to seek relief on

behalf of a plan.[5]  Some courts have agreed with MoneyGram's interpretation of *LaRue*.  *See, e.g., Vaughn v. Bay Envtl. Mgmt., Inc.*, 544 F.3d 1008, 1014 n.9 (9th Cir. 2008) ("*LaRue* does not control the outcome of this case because it did not address the meaning of 'participant' or the distinction between benefits and damages"); *Gipson v. Wells Fargo & Co.*, No. 08-4546, 2009 WL 702004, at *3 (D. Minn. Mar. 13, 2009) ("This Court is not convinced that the *LaRue* footnote means that all former plan participants have standing to bring claims for a breach of fiduciary duty under ERISA.").

 The Court respectfully disagrees with these courts and holds that, under *LaRue*, the plaintiffs in this case have standing.  The defendants' motion to dismiss in *LaRue* rested on the argument that, after cashing out, the plaintiff had "no legally cognizable interest in the outcome

---

 [5]*Adamson* does not, in fact, establish that a cashed-out former employee can never be a "participant" in a plan for purposes of ERISA.  In *Adamson*, the Eighth Circuit held that former employees who had *allowed their claims for benefits to become time-barred* were no longer "participants" and therefore lacked standing to bring claims for breach of fiduciary duty under §§ 1132(a)(2) and (3).  *Adamson*, 44 F.3d at 654.  That holding is unremarkable, given that an employee whose claim for benefits is time-barred no longer has a colorable claim for vested benefits and thus no longer is a participant.  But the claims of Morrison and Arguello are not time-barred.  Thus, although *Adamson* establishes the proposition that a plaintiff must have a colorable claim for benefits to be a "participant" capable of bringing claims under §§ 1132(a)(2) and (3), *Adamson* does not answer the question whether Morrison and Arguello have such a claim.

 *Gilquist* is much closer to the mark.  In *Gilquist*, which was summarily affirmed by the Eighth Circuit (and is not really precedential, *see Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 603 (8th Cir. 1995)), the district court held that plaintiffs who had received lump-sum distributions of benefits from an employee stock ownership plan were no longer participants in the plan.  *Gilquist*, 675 F. Supp. at 1171.  The district court based its decision on its determination that, if the plaintiffs prevailed in proving a breach of fiduciary duty, any recovery they obtained would be "damages" rather than "benefits" under the plan.  *Id.*  As explained above, though, *Harzewski* explicitly (and, in this Court's view, convincingly) rejected this distinction between "benefits" and "damages," and *LaRue* relied on *Harzewski*'s analysis to find that the plaintiff's claims were not moot.  To the extent that *Gilquist* is inconsistent with *LaRue*, therefore, it has been overruled.

-13-

of the case." Motion to Dismiss the Writ at 2, *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 128 S.

Ct. 1020 (2008) (No. 06-856), 2007 WL 3231419. The defendants were necessarily arguing that

the plaintiff did not have a colorable claim for vested benefits, because a plaintiff with a

colorable claim for vested benefits obviously has a "legally cognizable interest in the outcome of

the case." And because the plaintiff did not have a colorable claim for benefits, the defendants

argued, the plaintiff was "no longer a participant entitled to maintain a claim . . . ." *Id.* at 4.

The Supreme Court rejected this argument, unambiguously holding that "the case is not

moot." *LaRue*, 128 S. Ct. at 1026 n.6. The Court explained its holding in two sentences: "A

plan 'participant,' as defined by § 3(7) of ERISA, 29 U.S.C. § 1002(7), may include a former

employee with a colorable claim for benefits. *See, e.g.*, *Harzewski v. Guidant Corp.*, 489 F.3d

799 (C.A.7 2007)." *LaRue*, 128 S. Ct. at 1026 n.6. Plainly, then, the Court held that the case

was not moot because, as a "former employee with a colorable claim for benefits," the plaintiff in

*LaRue* did indeed have a legally cognizable interest in the outcome of the case, and was indeed a

plan "participant" for purposes of ERISA.

In light of what the defendants argued in asking that *LaRue* be dismissed as moot, in light

of the Supreme Court's unambiguous holding that "the case is not moot," in light of the Supreme

Court's explanation of its holding, and in light of the Supreme Court's citation of *Harzewski* (and

only *Harzewski*) in support of its holding, this Court cannot agree with MoneyGram that *LaRue*

somehow left open the question of whether the cashed-out plaintiff was a "participant" for

purposes of §§ 1132(a)(2) and (3).

MoneyGram also suggests that *LaRue* turned on the fact that, at the time the plaintiff filed

suit, he had not yet cashed out of his retirement plan. But *LaRue* did not even mention that fact.

Moreover, *LaRue* cited *Harzewski*, in which the Seventh Circuit pointedly declined to rely on the fact that the plaintiffs had not cashed out until after filing their initial complaint.  More importantly, the fact that the plaintiff in *LaRue* had standing at the time his suit was filed does not, as MoneyGram implies, suggest that his case could not later be dismissed as moot.  The latter in no way follows from the former.

The bottom line is that the defendants in *LaRue* argued that, at the moment the plaintiff cashed out, the plaintiff no longer had a colorable claim for benefits or any other legally cognizable interest in the outcome of the case.  The Supreme Court rejected the argument, holding that, because the plaintiff continued to have a colorable claim for benefits even after cashing out, the case was not moot, and the plaintiff was a "participant" for purposes of §§ 1132(a)(2) and (3).  That holding controls the outcome in this case and compels a conclusion that, like the plaintiffs in *LaRue* and *Harzewski*, Morrison and Arguello are "participants" with colorable claims to vested benefits.

In a final effort to get out from under *LaRue*, MoneyGram contends that a Supreme Court decision on a motion to dismiss as moot is extraneous to the issues that the Supreme Court accepted for review and therefore is not binding on lower courts.  Not surprisingly, MoneyGram cites no authority that supports its contention that a holding of the Supreme Court regarding mootness binds the lower federal courts only if the Supreme Court issued a writ of certiorari to address the issue of mootness.  In *Thompson v. Paasche*, 950 F.2d 306 (6th Cir. 1991) — a case cited by MoneyGram — the Sixth Circuit declined to give precedential weight to *City of Springfield v. Kibbe*, 480 U.S. 257 (1987).  In *City of Springfield*, the Supreme Court dismissed a writ of certiorari as improvidently granted because the petitioner had failed to preserve an issue.

-15-

Putting aside the fact that neither *City of Springfield* nor *Thompson* had anything to do with mootness, a decision to "D.I.G." a case — that is, to dismiss the writ of certiorari as improvidently granted — is a decision *not* to render a decision.  The fact that *Thompson* chose not to give precedential weight to a decision not to decide in no way suggests that a lower court is free to avoid giving precedential weight to a decision on mootness or any other issue.

The other case that MoneyGram cites — *Martinez v. City of Oxnard*, 270 F.3d 852 (9th Cir. 2001), *rev'd sub nom. Chavez v. Martinez*, 538 U.S. 760 (2003) — merely states that lower courts are not bound by dicta in Supreme Court opinions.  *Id.* at 857 n.3.  But what the Court said about mootness in *LaRue* was not dicta.  It was necessary to the Court's decision on the merits, because if the case had been moot, the Court would not have had the power to reach the merits.  *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (per curiam) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies.").  Thus the Supreme Court's decision about mootness was a holding — a holding that lower federal courts are not free to ignore.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

In sum, this Court holds that, under *LaRue*, Morrison and Arguello both have a colorable claim for vested benefits and therefore are "participants" in the Plan with the right to bring suit against MoneyGram under §§ 1132(a)(2) and (3).  MoneyGram's motion to dismiss for lack of subject-matter jurisdiction is denied.

### B.  Rule 12(b)(6)

MoneyGram argues that, even if plaintiffs have the right to sue under §§ 1132(a)(2) and

(3), their claims must be dismissed on the merits under Fed. R. Civ. P. 12(b)(6).  In reviewing a

Rule 12(b)(6) motion, a court accepts as true all factual allegations in the complaint and draws all

reasonable inferences in the plaintiff's favor.  *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th

Cir. 2008); *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004); *Mattes v. ABC Plastics, Inc.*,

323 F.3d 695, 697 (8th Cir. 2003).  Although the factual allegations in the complaint need not be

detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ."  *Bell

Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings,

a Rule 12(b)(6) motion must be treated as a motion for summary judgment.  Fed. R. Civ.

P. 12(d).  But the court may consider materials that are necessarily embraced by the complaint

(such as the Plan, the SPD, and the Trust), as well as any exhibits attached to the complaint,

without converting the motion into one for summary judgment.  *Mattes*, 323 F.3d at 697 n.4.

### 1.  The Scope of a Fiduciary's Duties under ERISA

The fiduciaries of an ERISA plan have responsibilities to the participants and

beneficiaries of the plan that are similar to the responsibilities imposed on fiduciaries under the

common law of trusts.  *See Pegram v. Herdrich*, 530 U.S. 211, 224 (2000).  But ERISA differs

from trust law in one important respect:  Unlike the common law of trusts, ERISA permits

fiduciaries to take actions adverse to beneficiaries, as long as the fiduciary is not acting in his

capacity as a fiduciary when he takes adverse action.  *Id.* at 225-26; *see also* § 1002(21)(A)

(providing that a person is a fiduciary "to the extent" that he exercises certain types of authority

-17-

or control over the plan or its assets).  To establish that a particular action was a breach of

fiduciary duty, then, it is not sufficient to prove that the person who took the action was a plan

fiduciary.  The plaintiff must also prove that, at the time that the person took the action, he was

*acting* as a plan fiduciary.  *Pegram*, 530 U.S. at 226; *see also Hughes Aircraft Co. v. Jacobson*,

525 U.S. 432, 444-45 (1999) (a plan sponsor's decision to amend a plan is not a fiduciary act and

so cannot constitute a breach of fiduciary duty); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890

(1996) (same).

      Under ERISA, a plan fiduciary's responsibilities include the following:

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title,
> a fiduciary shall discharge his duties with respect to a plan solely in
> the interest of the participants and beneficiaries and —
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their
> > > beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering
> > > the plan;
> >
> > (B) with the care, skill, prudence, and diligence under the
> > circumstances then prevailing that a prudent man acting in
> > a like capacity and familiar with such matters would use in
> > the conduct of an enterprise of a like character and with like
> > aims;
> >
> > (C) by diversifying the investments of the plan so as to
> > minimize the risk of large losses, unless under the
> > circumstances it is clearly prudent not to do so; and
> >
> > (D) in accordance with the documents and instruments
> > governing the plan insofar as such documents and
> > instruments are consistent with the provisions of this
> > subchapter and subchapter III of this chapter.

§ 1104(a)(1).  The duties set forth in § 1104(a) are commonly referred to as the duty of prudence,

the duty of loyalty, the duty to diversify, and the duty to follow the terms of the plan.  *See Brown*

*v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999); Craig C. Martin et al., *What's Up*

*on Stock-Drops?* Moench *Revisited*, 39 J. Marshall L. Rev. 605, 608-09 (2006).

        Not all of these duties are imposed on every benefit plan governed by ERISA.  In

particular, a defined-contribution plan known as an "eligible individual account plan" (or

"EIAP") — such as the Plan that is the subject of this litigation — is exempt from several of the

requirements that ERISA generally imposes on benefit plans.  *See* § 1107(d)(3) (defining EIAPs).

For example, EIAPs are not subject to the 10% cap on investments in employer stock,

§ 1107(b)(1), and ERISA's prohibitions against dealing with a party in interest and self-dealing

do not apply to an EIAP's acquisition or sale of employer stock, § 1108(e).  In addition — and

critically for purposes of this case — an EIAP's acquisition or holding of employer stock cannot

be the basis of a claim that a fiduciary has violated the duty to diversify:  "In the case of an

eligible individual account plan . . . the diversification requirement of paragraph (1)(C) and the

prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is

not violated by acquisition or holding of qualifying employer real property or qualifying

employer securities . . . ."  § 1104(a)(2).  These exemptions are necessary to enable EIAPs to

fulfill one of their recognized purposes: to foster employee investment in employer securities.

*See Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007).  These exemptions also pose

formidable challenges to anyone who seeks to challenge the decision of the fiduciaries of an

EIAP to invest in employer stock.

2.  Count I

In Count I of the amended complaint, plaintiffs allege that defendants breached their duty of prudence by investing Plan assets in MoneyGram stock, which plaintiffs allege was an imprudent investment.[6]  MoneyGram argues that Count I fails to state a claim because, pursuant to the documents governing the Plan, MoneyGram was legally obligated to invest all employer contributions in MoneyGram stock.  According to MoneyGram, that fact alone requires the dismissal of Count I.  Even if it does not, MoneyGram argues that defendants are at least entitled to a presumption that the investments in MoneyGram stock were prudent, and plaintiffs cannot overcome this presumption — and thus cannot state a claim — unless they allege facts demonstrating that MoneyGram's continued viability as a company was in jeopardy.  Because plaintiffs have failed to allege such facts, MoneyGram contends, Count I must be dismissed.

*a.  Whether the Plan Requires Investment in the Employer Stock Fund*

The first question that must be resolved is whether, as MoneyGram alleges, it simply had no choice but to invest its employer contributions in MoneyGram stock.  MoneyGram points to Article 7 of the Plan, which states, in relevant part:

---

[6]The counts in the amended complaint contain overlapping claims.  For example, in addition to alleging that MoneyGram breached its duties by investing Plan assets in MoneyGram stock, Count I also alleges that MoneyGram breached its duties by failing to disclose material information, and Count I alleges co-fiduciary liability.  But plaintiffs have pleaded separate claims of misrepresentation, failure to disclose, and co-fiduciary liability that mirror portions of Count I.  For simplicity's sake, the Court will discuss each type of claim separately in connection with the count in which it is mainly alleged.

The Court notes that plaintiffs allege in Count I that MoneyGram's investment of Plan assets in MoneyGram stock breached the duty of loyalty as well as the duty of prudence.  But plaintiffs' breach-of-loyalty claim boils down to an allegation that defendants made imprudent investments.  As the allegation of breach of the duty of loyalty adds nothing of substance to the allegation of breach of the duty of prudence, the Court will discuss only the latter allegation.

7.2     Employee Selected Investment Options, Investment Funds.

(a)     Each Participant shall designate the Investment Fund(s),
        established pursuant to paragraph (b) below, to which
        amounts allocated to the Participant's Accounts, (including
        his or her MoneyGram Match Account, Prior Company
        Match Account and Profit Sharing Account) are to be
        invested.

(b)     The Committee shall direct the Trustee to establish three
        (3) or more Investment Funds.  The Committee also may
        direct the Trustee to change the number and type of
        Investment Funds made available under the Plan from time
        to time, without the necessity of Board action or Plan
        Amendment.

(c)     Three of the Investment Funds under the Plan are the
        FINOVA Stock Fund, the Viad Stock Fund, and the
        Employer Stock Fund consisting, respectively, of FINOVA
        Stock, Viad Stock, and Employer Stock. . . .

7.3     Investment Elections for Future Contributions.

(a)     . . . .  Amounts allocated to a Participant's
        MoneyGram Match Account and Profit
        Sharing Account are initially invested in the
        Employer Stock Fund.  Such amounts
        remain invested in the Employer Stock Fund
        until a Participant transfers all or a portion
        (in no less than one percent (1%)
        increments) of his MoneyGram Match
        Account and Profit Sharing Account to any
        of the then available Investment Funds.

MoneyGram argues that the language of § 7.3(a) plainly requires that employer contributions be

invested in the Employer Stock Fund, which, MoneyGram points out, must consist solely of

MoneyGram common stock.  *See* Plan § 2.1(dd), (ee) (defining "Employer Stock" to mean

MoneyGram common stock and "Employer Stock Fund" to mean "the Investment Fund

established pursuant to section 7.2 which invests in Employer Stock"); Plan § 2.1(rr), (ss)

(defining "MoneyGram Match" to mean an employer contribution made pursuant to § 4.1(b) of the Plan and "MoneyGram Match Account" to be the account maintained to record a participant's share of MoneyGram Match); Plan § 2.1(ddd), (eee) (defining "Profit Sharing Contribution" to mean an employer contribution made pursuant to § 4.1(c) of the Plan and a "Profit Sharing Account" to be the account maintained to record a participant's share of Profit Sharing Contributions).

MoneyGram is correct that, when read in isolation, § 7.3(a) does indeed seem to require that employer contributions be invested in the Employer Stock Fund.  But when § 7.3(a) is read in the context of the Plan as a whole, its meaning is less clear.  Under § 7.2(b), "[t]he Committee . . . may direct the Trustee to change the number and type of Investment Funds made available under the Plan from time to time, without the necessity of Board action or Plan Amendment."  Plan § 7.2(b).  Given that the Employer Stock Fund referenced in § 7.3(a) is defined as an "Investment Fund" under § 7.2(c), the Committee arguably had the authority to discontinue the Employer Stock Fund altogether under § 7.2(b).

Indeed, as plaintiffs point out, there is evidence that MoneyGram thought that the language of § 7.2(b) granted exactly that power to the Committee.  In January 2008, MoneyGram amended § 7.2(c) of the Plan to read, in relevant part:

> Notwithstanding the Committee's authority under section 7.2(b) to establish, change or remove Investment Funds, the Plan shall maintain one Investment Fund that is invested exclusively in Employer Stock (the "Employer Stock Fund") . . . .

Second Swanson Decl. Ex. E § 1.  MoneyGram would not have amended § 7.2(c) to forbid the Committee from discontinuing the Employer Stock Fund unless MoneyGram believed that the

Committee had the authority to discontinue the Employer Stock Fund — or at least that § 7.2(b) was ambiguous on the question.

The fact that MoneyGram apparently believed that the pre-amendment version of the Plan granted the Committee the power to discontinue the Employer Stock Fund is particularly significant because the Plan grants the Committee the power to interpret the Plan and resolve any ambiguities in it. *See* Plan §§ 8.10(b), 8.12. This provision is apparently a delegation of MoneyGram's discretion to interpret the Plan. *See* SPD at 1. At the very least, the pre-amendment version of § 7 of the Plan — which was the version in effect during the time period relevant to this case — was ambiguous with respect to the extent of the Committee's power to discontinue the Employer Stock Fund. This ambiguity cannot be resolved on a motion to dismiss, especially given that determining the meaning of the Plan language may rest in part on how the Committee (acting on behalf of MoneyGram) interpreted the Plan. *Cf. Moench v. Robertson*, 62 F.3d 553, 566-67 (3d Cir. 1995) (applying the five-factor test articulated in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992) to review a plan committee's claim that the plan was required to invest exclusively in employer stock).

Aside from the ambiguity in § 7 of the Plan, there is language in another section of the Plan that supports plaintiffs' argument that employer contributions were not required to be invested in the Employer Stock Fund. Under § 8.10(o) of the Plan, the Committee has the discretion "[t]emporarily to delay, suspend, or prohibit . . . Investment Elections, changes in Investment Elections, transfer of assets, or *any other transaction under the Plan* for any purpose that the Committee, in its sole discretion, deems lawful (e.g. a fiduciary concern . . .)." Plan

-23-

§ 8.10(o) (emphasis added).  This broad language can easily be read to permit the Committee to suspend or prohibit further investments in the Employer Stock Fund.

Finally, plaintiffs point to language in the Trust — which is incorporated into the Plan, *see* Plan § 1.1 — that imposes on MoneyGram the duty of "[d]etermining the suitability of and selecting every investment offered as an option under the Plan, including but not limited to Qualifying Employer Securities . . . ."  Trust § 4.1(g).  MoneyGram argues that the purpose of § 4.1(g) is to make clear the division of authority between MoneyGram and the Trustee. Specifically, the provision makes clear that the Trustee has no hand in selecting the investments offered in the Plan.  Rather, that function belongs to MoneyGram acting in its capacity as the Plan sponsor, and not in its capacity as a Plan fiduciary.

MoneyGram's interpretation, however, is undermined by the beginning of § 4.1, which states that the duties defined in § 4.1 may be carried out by MoneyGram acting through the named fiduciary.  The fact that MoneyGram could delegate its responsibility for determining the suitability of Plan investments to a fiduciary suggests that this function may have been a fiduciary one.  *Cf. DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3 (4th Cir. 2007) ("[L]imiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA 404(c) plan is a *fiduciary function* . . . .  [A]lthough section 404(c) does limit a fiduciary's liability for losses that occur when participants make poor choices . . . it does not insulate a fiduciary from liability for assembling an imprudent menu in the first instance." (citations and quotations omitted)).

Contrary to MoneyGram's contentions, then, the Plan did not clearly require MoneyGram to invest all employer contributions in the Employer Stock Fund.  In fact, the provisions of the

Plan identified above point to the opposite conclusion.  The Plan is ambiguous, making it impossible for the Court to determine the meaning of the Plan in response to a Rule 12(b)(6) motion.  Thus, insofar as MoneyGram's motion to dismiss relies on the contention that it had no alternative but to invest employer contributions in the Employer Stock Fund, MoneyGram's motion is denied.

To be clear:  The Court is holding only that the Plan is ambiguous.  It is possible that, after discovery is concluded, MoneyGram will be able to persuade the Court on motion for summary judgment or at trial that MoneyGram was indeed required to invest all employer contributions in the Employer Stock Fund.  If MoneyGram ultimately prevails on that issue, though, MoneyGram will not necessarily escape liability under Count I.[7]  ERISA requires fiduciaries to comply with the terms of plan documents, as MoneyGram stresses.  But this duty is not unqualified; it applies only "insofar as such documents and instruments are consistent with the provisions of" subchapters I and III of ERISA, which include the other fiduciary duties imposed under § 1104.  *See* § 1104(a)(1)(D); *In re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 883, 889-90 (E.D. Mich. 2008).  The Court leaves this issue for another day.

### b.  The Presumption of Prudence

The parties next dispute whether MoneyGram's decision to continue investing employer contributions in the Employer Stock Fund is entitled to a presumption of prudence and, assuming that such a presumption applies, whether plaintiffs' allegations are sufficient to overcome it.

---

[7]At the same time, if MoneyGram ultimately prevails on this issue, plaintiffs will not be permitted to argue that MoneyGram had a fiduciary duty to amend the Plan.  The law is quite clear that the decision to amend an ERISA plan is not a fiduciary one, even if the plan is one to which employees contribute.  *Hughes Aircraft Co.*, 525 U.S. at 444-45.

A presumption of prudence was first applied to a fiduciary's decision to continue

investing in employer stock in the landmark case of *Moench v. Robertson*, 62 F.3d 553 (3d Cir.

1995).  In *Moench*, a former participant in an employee stock ownership plan ("ESOP") sued the

plan's fiduciaries over their decision to keep the plan's assets invested almost entirely in

employer stock during a period in which that stock lost nearly 99% of its value.  *Id.* at 557, 559-

60.  *Moench* recognized that ESOPs are, by definition, designed to invest primarily in employer

stock.  *Id.* at 568.  At the same time, ESOP fiduciaries must act in accordance with the duties of

prudence and loyalty.  *Id.* at 569.  To balance these potentially competing considerations, *Moench*

applied a presumption of prudence to the fiduciaries' decision to remain invested in employer

stock.  *Id.* at 571.  To overcome the presumption, a plaintiff must show that the fiduciary abused

its discretion.  *Id.*

Plaintiffs argue that *Moench* is inapplicable because it concerned an ESOP, whereas the

plan at issue in this case is an EIAP.  *See In re Westar Energy, Inc. ERISA Litig.*, No. 03-4032,

2005 WL 2403832, at *18-19 (D. Kan. Sept. 29, 2005) (declining to apply a presumption of

prudence to a non-ESOP EIAP).  But an ESOP is just one type of EIAP, and all EIAPs are

designed to foster investment in employer stock.  Many of the distinguishing features of ESOPs

on which *Moench* relied — such as the exemption from the duty to diversify, the exemption from

the 10% cap on investments in employer stock, and the limited exemption from the prohibition

on self-dealing and dealing with parties in interest — apply to all EIAPs, not just ESOPs.  For

that reason, the Third Circuit recently extended the *Moench* presumption to all EIAPs.  *See*

*Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007).

It is true that ESOPs, unlike EIAPs in general, are designed to invest *primarily* in employer stock.  § 1107(d)(6)(A).  But it is difficult to know why that would justify applying the *Moench* presumption to ESOPs, but not to other EIAPs.  ERISA expressly exempts all EIAPs — ESOPs and non-ESOPs alike — from the duty to diversify.  In other words, a plaintiff cannot seek to hold a fiduciary liable for the *extent* to which any EIAP invests in employer stock.  Such a claim would challenge the mix of assets held by an EIAP, and thus would be tantamount to a claim that the fiduciary did not diversify — or diversify sufficiently.  To get around MoneyGram's exemption from the duty to diversify, plaintiffs must allege that MoneyGram stock was such an imprudent investment that *no* Plan assets — not one cent — should have been invested in it.[8]  Such an allegation — that is, an allegation that a fiduciary ought to have divested an EIAP of *all* employer stock — strikes at the policy considerations underlying the creation of an EIAP, whether the EIAP is an ESOP or not.  The Court therefore agrees with the Third Circuit that the *Moench* presumption should extend to all EIAPs, including the Plan.

The next question, then, is what type of allegations are necessary to overcome the *Moench* presumption.  MoneyGram argues that, to overcome the presumption of prudence, a plaintiff must allege that the employer was on the verge of collapse.  Plaintiffs have a threefold response: first, plaintiffs argue that the presumption is not applicable at the pleading stage;

---

[8]*Moench*, and a number of cases following it, suggest that fiduciaries of EIAPs may be required to diversify if that is in the best interest of plan participants.  *Moench*, 62 F.3d at 569-70, 571; *see also Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 410-11 (7th Cir. 2006); *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003); *Kuper v. Iovenko*, 66 F.3d 1447, 1457-59 (6th Cir. 1995).  But this position appears inconsistent with the exemption from the duty to diversify in § 1104(a)(2).  How can fiduciaries of EIAPs be held liable for failing to diversify — that is, for investing too much in employer stock, and not enough in other assets — when ERISA explicitly provides that they do not have a duty to diversify?

second, plaintiffs argue that they need not allege that the employer is on the verge of collapse, but only that a prudent fiduciary would have made a different investment decision; and finally, plaintiffs argue that they have met the burden of alleging that MoneyGram was on the verge of collapse.

Plaintiffs' first argument is easily overcome. Under *Bell Atlantic*, plaintiffs must allege facts sufficient to "raise a right to relief above the speculative level . . . ." 127 S. Ct. at 1964-65. The presumption of prudence is a legal presumption that limits the circumstances under which a fiduciary of an EIAP can be found liable. In other words, the presumption defines the elements of a plaintiff's substantive cause of action. To say that the presumption of prudence "applies" at the pleading stage is just another way of saying that plaintiffs must allege sufficient facts to demonstrate that they have a non-speculative claim that the fiduciary abused its discretion (or otherwise acted in a manner that would overcome the *Moench* presumption). If plaintiffs plead facts demonstrating that there was no abuse of discretion, or if they fail to plead facts that would tend to establish an abuse of discretion, then dismissal under Rule 12(b)(6) is warranted. *Cf. Edgar*, 503 F.3d at 342 (applying the presumption on appeal from the grant of a motion to dismiss).

As for plaintiffs' second contention — that the presumption can be overcome merely by showing that a prudent fiduciary would have made a different investment decision — such a standard would render the presumption meaningless. *Cf. Moench*, 62 F.3d at 570 (noting that subjecting a fiduciary's decision to invest in employer stock to strict judicial scrutiny would risk transforming ESOPs into ordinary pension benefit plans). Under plaintiffs' standard, fiduciaries would be expected to maximize the EIAP's investment returns without regard to the special

purposes of EIAPs, yet at the same time would be subject to the risk of liability for deviating

from the terms of the EIAP.  *Moench* created the presumption of prudence to avoid this very

dilemma.  Under *Moench*, it is not enough to show that a prudent fiduciary would have made a

different investment decision.  Instead, plaintiffs must "introduce evidence that 'owing to

circumstances not known to the settlor and not anticipated by him [the making of such

investment] would defeat or substantially impair the accomplishment of the purposes of the

trust.'"  *Moench*, 62 F.3d at 571 (quoting Restatement (Second) of Trusts § 227 cmt. w (1959))[9];

*see also Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008) ("there ought to

be persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would

have considered themselves bound to divest").

      Whether plaintiffs must allege that the employer was on the verge of collapse to

overcome the *Moench* presumption is a closer question.  Although there is language in some

cases suggesting that such an allegation is necessary, recent decisions have stopped short of

requiring it.  In other words, although everyone agrees that proving that the employer was on the

verge of collapse is *one* way to overcome the presumption, most courts seem to hold that it is not

the *only* way.  *See, e.g.*, *Kirschbaum*, 526 F.3d at 256 ("We do not hold that the *Moench*

presumption applies only in the case of investments in stock of a company that is about to

collapse."); *Edgar*, 503 F.3d at 349 n.13 ("We do not interpret *Moench* as requiring a company to

be on the brink of bankruptcy before a fiduciary is required to divest a plan of employer

securities.").  *But see DiFelice*, 497 F.3d at 420-21, 425 (stating that "the Employees cannot

---

[9]*Moench* mistakenly cites comment g, which does not contain any of the quoted language.
Comment w to § 227 includes all of the quoted language, including the bracketed insertion.

succeed in this lawsuit simply by demonstrating that U.S. Airways offered the Company Fund

during a time of grave uncertainty for the company" and affirming judgment in favor of the

fiduciaries on the basis of the district court's finding that the fiduciaries reasonably believed that

the company would be able to avoid bankruptcy).

At the same time, it is clear that the *Moench* presumption is not overcome simply by

pleading and proving that the price of the employer's stock dropped steeply, even when the drop

was based on the disclosure of some type of misconduct.  *See Kirschbaum*, 526 F.3d at 255 (40%

drop in stock price after disclosure of improper "round-trip" energy trading was insufficient to

overcome presumption); *Pugh v. Tribune Co.*, 521 F.3d 686, 701-02 (7th Cir. 2008) (suggesting

that disclosure of circulation fraud, which ultimately caused a charge against earnings of less than

2% of employer's yearly revenues, was insufficient to state a claim); *Wright v. Oregon

Metallurgical Corp.*, 360 F.3d 1090, 1096, 1098-99 (9th Cir. 2004) (72% drop in stock price

after merger was insufficient to state a claim in light of the fact that the employer was profitable

and paying substantial dividends).

The case law is thus helpful in defining what is always sufficient to overcome the *Moench*

presumption (an employer on the verge of collapse) and what is never sufficient, at least by itself,

to overcome the presumption (a drop in the price of the employer' stock).  But, between these

two extremes, what exactly must a plaintiff plead and prove to overcome the *Moench*

presumption?

There may not be a good answer to this question, but this Court finds persuasive the

recent opinion of Judge Stephen Murphy in *In re Ford Motor Co. ERISA Litigation*, 590

F. Supp. 2d 883 (E.D. Mich. 2008).  Judge Murphy wrote:

. . . ERISA excuses [EIAP] fiduciaries from "the prudence requirement (only to the extent that it requires diversification)." 29 U.S.C. § 1104(a)(2). This is necessary because, as many courts have noted, it is almost always imprudently risky to invest most or all of a fund's assets in a single stock.

But the statutory language plainly retains the duty of prudence *except* insofar as it would dictate diversification. As a result, this Court finds that the [*Moench*] presumption of prudence means that 29 U.S.C. § 1104(a)(1)-(2) requires fiduciaries to divest their plans of company stock when holding it becomes so risky — that is, so imprudent — that the problem could not be fixed by diversifying into other assets. In other words, with respect to EIAPs, an abuse of discretion under [*Moench*] begins (and the presumption of prudence ends) at the point at which company stock becomes so risky that no prudent fiduciary, reasonably aware of the needs and risk tolerance of the plan's beneficiaries, would invest *any* plan assets in it, regardless of what other stocks were also in that plan's portfolio.

*Id.* at 892-93 (footnote and citations omitted).

As Judge Murphy explained, this excessive-risk standard comports with the statutory exemption from the diversification requirement. The *Moench* presumption may not be overcome by proof that the EIAP fiduciary invested *too heavily* in employer stock, but only by proof that the fiduciary should not have invested *at all* in employer stock. At the same time, this standard gives effect to the regulations implementing ERISA, which require a fiduciary to "'tak[e] into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action.'" *Id.* at 891 (quoting 29 C.F.R. § 2550.404a-1(b)(2)(i)). As Judge Murphy conceded, the excessive-risk standard does not provide a bright-line rule for fiduciaries, but given that the statutory prudence standard itself provides no bright-line rules, it would be inconsistent with ERISA to create one. *Id.* at 892. Alleging that the employer was on the verge of collapse is certainly one way to show that the employer's stock was

excessively risky, but it would be inconsistent with ERISA to hold, as a matter of law, that such

an allegation is the only way to state a claim.  *Id.* at 891-92.

The Court finds this analysis persuasive.  Applying the excessive-risk standard as

described in *Ford Motor Co.*, the Court holds that plaintiffs have pleaded sufficient facts to

survive a motion to dismiss.  Plaintiffs allege that MoneyGram was suffering enormous

investment losses throughout the class period — approximately $1.6 billion, at last count.

Plaintiffs further allege that these losses were due to MoneyGram's pursuit of an extraordinarily

speculative and unnecessary investment strategy that involved borrowing money and investing it

in risky mortgage-backed securities.  This strategy, plaintiffs allege, put at least two-thirds of

MoneyGram's investment portfolio at risk and was already beginning to fail at the inception of

the Plan, but it was not disclosed to the market until years later.  Under these conditions,

plaintiffs allege, MoneyGram's stock price was poised to collapse, and ultimately, as of

March 2008, it had lost 92% of its value over the preceding year.  After MoneyGram's enormous

losses were finally disclosed to the market, the SEC initiated an investigation into MoneyGram's

accounting practices, and MoneyGram was forced to seek a large infusion of outside capital.

In the Court's view, these allegations, taken as a whole, sufficiently allege that at some

point "[MoneyGram] stock [became] so risky that no prudent fiduciary, reasonably aware of the

needs and risk tolerance of the plan's beneficiaries, would [have] invest[ed] *any* plan assets in it,

regardless of what other stocks were also in th[e] plan's portfolio."  *Ford Motor Co.*, 590

F. Supp.2d at 893.  Indeed, these allegations are similar to those in *Moench* itself, in which the

employer's stock lost 98% of its value over a period of two years, there were allegations of

serious mismanagement, regulatory authorities had expressed concerns about the health of the

employer's subsidiaries, and the employer ultimately went out of business. *Moench*, 62 F.3d at 557. Although plaintiffs' allegations do not present quite as dire a picture as did the facts in *Moench*, the Court believes they are sufficient to overcome the *Moench* presumption and allow plaintiffs to pursue a claim for breach of the duty of prudence. MoneyGram's motion to dismiss is therefore denied as to Count I.

### 3. Count II

The duty of loyalty "includes the obligation to deal fairly and honestly with all plan members" and "requires an ERISA fiduciary to communicate any material facts which could adversely affect a plan member's interests." *Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir. 1997). In Count II, plaintiffs allege that MoneyGram breached its duty of loyalty by (1) disseminating to Plan participants inaccurate information that was relevant to evaluating MoneyGram's financial condition and (2) failing to disclose information about its business practices and investment strategy that was necessary for Plan participants to make informed investment decisions. MoneyGram makes a number of arguments in support of dismissal of Count II, which the Court considers in turn.

### a. Fiduciary Communications

As noted earlier, to prevail on a claim for a breach of fiduciary duty, a plaintiff must prove not only that the challenged action was taken by a fiduciary, but that the fiduciary was acting in his fiduciary capacity when he took the challenged action. Plaintiffs' misrepresentation claim is based largely on information contained in MoneyGram's SEC filings, which, plaintiffs allege, were incorporated into Plan documents and disseminated to Plan participants.

MoneyGram argues that it never incorporated its SEC filings into any Plan documents and that disclosures mandated by the securities laws are not fiduciary communications.

Although there are decisions on both sides of the issue, the Court agrees with the decisions that have held that SEC filings are made in a company's corporate capacity — and not in its capacity as an ERISA fiduciary — and therefore do not, without more, constitute fiduciary communications. *See, e.g.*, *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 760 (S.D.N.Y. 2003) (mere act of signing and filing SEC disclosures is not a fiduciary act). If the contrary were true, any corporate officer who signed an SEC filing would become a fiduciary of the company's ERISA plan (assuming that the plan invested in employer securities). Such an improbable result seems at odds with the general rule that a person's status as a corporate officer does not, by itself, transform that person into a fiduciary of the corporation's ERISA plan. 29 C.F.R. § 2509.75-8 at D-5.

This is not a securities-fraud action. If, at the end of the day, plaintiffs are able to prove nothing more than that MoneyGram's SEC filings were inaccurate, and that the inaccurate information was made available to plaintiffs in the same manner that it was made available to the rest of the investing public, then the Court will likely dismiss the breach-of-loyalty claim.

But plaintiffs allege something more. Specifically, plaintiffs allege that MoneyGram incorporated its SEC filings into the SPD and into Plan prospectuses, and then, acting in its capacity as an ERISA fiduciary, MoneyGram distributed the SPD and Plan prospectuses to participants. Am. Compl. ¶ 46. In other words, plaintiffs allege that MoneyGram's SEC filings became fiduciary communications by virtue of being incorporated into the SPD and Plan prospectuses.

There is little in the SPD to support plaintiffs' claim,[10] but this matter is before the Court on a Rule 12(b)(6) motion. Such a motion tests the sufficiency of allegations, not the sufficiency of evidence, and plaintiffs have *alleged* that MoneyGram distributed SEC filings to Plan participants in its capacity as an ERISA fiduciary. That allegation is sufficient to state a claim. *Cf. Varity Corp. v. Howe*, 516 U.S. 489, 505 (1996) (company acted as a fiduciary when it intentionally connected statements about a subsidiary's financial health to statements about the future of benefits to be paid by that subsidiary); *In re WorldCom*, 263 F. Supp. 2d at 765-67 (although mere act of signing and filing SEC-disclosures was not a fiduciary act, plaintiffs stated a claim by alleging that defendants disseminated such disclosures to plan participants in prospectuses).

MoneyGram argues that, because the Employer Stock Fund was closed to all but employer contributions, MoneyGram had no legal duty to disseminate prospectuses or similar SEC-mandated disclosures to Plan participants. That may be true, but the fact that MoneyGram was not required to disseminate such documents to Plan participants does not mean that MoneyGram did not voluntarily do so, as plaintiffs have alleged.

Obviously, the Court does not mean to suggest that plaintiffs will recover on their breach-of-loyalty claim if they prove only that, at some point, MoneyGram distributed a prospectus to

---

[10]The language to which plaintiffs point merely states that Plan participants will be given information about the various investment funds available under the Plan. *See, e.g.*, SPD at 8. While this language may be relevant in proving that MoneyGram acted as a Plan fiduciary whenever it disseminated information about the investment funds to Plan participants, this language does not itself incorporate any information into the SPD. Similarly, plaintiffs highlight language in the Plan that requires MoneyGram to comply with any applicable securities laws, but that language also does not incorporate securities filings or anything else into the Plan.

them.  Plaintiffs have a number of hurdles to overcome.  At this point, however, plaintiffs have

sufficiently alleged a breach-of-loyalty claim.

### b. Rule 9(b)

MoneyGram next argues that Count II fails to meet the standards of Fed. R. Civ. P. 9(b),

which requires parties to allege "with particularity the circumstances constituting fraud or

mistake."  But plaintiffs' claims rest solely on negligence, and Rule 9(b) does not apply to

negligence claims.[11]  *Cf. In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314-15 (8th Cir.

1997) (particularity requirement of Rule 9(b) does not apply to allegations of innocent or

negligent misrepresentation that are "at the heart" of a claim under 15 U.S.C. § 77k(a), and so

long as the plaintiff intends only to plead such a claim, any insufficient averments of fraud are

"mere surplusage").

### c. Reliance and Causation

Plaintiffs allege both that "reliance is presumed in an ERISA breach of fiduciary duty

case" and, alternatively, that they in fact "relied to their detriment on the misstatements and

omissions [and] on the inaccurate and incomplete information that Defendants made to Plan

---

[11]It is not clear whether a claim of negligent misrepresentation is sufficient to state a claim for breach of the duty of loyalty.  *See Christensen v. Qwest Pension Plan*, 462 F.3d 913, 917 (8th Cir. 2006) (affirming judgment in favor of plan administrators because there was "no evidence that Plan administrators . . . knowingly provided false or materially overstated estimates of his pension benefit").  MoneyGram does not argue, however, that an allegation of negligent misrepresentation by a fiduciary is insufficient to state a claim for breach of the duty of loyalty (although MoneyGram argues that it has no *affirmative* duty to disclose information about its investment portfolio unless it had knowledge of some underlying fraud, *see* Reply 9-10 [Docket No. 25]).  Moreover, as discussed below, the Eighth Circuit has said that a fiduciary has a duty to disclose when "it knows *or should know* that the beneficiary is laboring under a material misunderstanding of plan benefits."  *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007) (emphasis added).  This suggests that fiduciaries are charged with the knowledge they should have acquired in the exercise of their duty of prudence.

Participants."  Am. Compl. ¶ 212.  Seizing on the former allegation and ignoring the latter, MoneyGram argues that plaintiffs have conceded that they did not rely on any misstatement or omission.  MoneyGram is obviously incorrect.

MoneyGram also argues that plaintiffs cannot prove a causal connection between any loss to the Plan and the alleged misrepresentations and omissions because, had MoneyGram made the disclosures that plaintiffs now contend should have been made, the value of MoneyGram stock would have dropped, and the Plan would have been damaged.  This seems logical, and most of what plaintiffs say in response is unavailing.  For example, plaintiffs cite *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599 (8th Cir. 1995), for the proposition that "[i]f a breach of fiduciary duty caused the Plan to purchase Company stock which declined in value, the causal link between the breach and the loss is established, even if the Company stock would have inevitably declined in value."  *Id.* at 605.  But defendants — who "caused the Plan to purchase Company stock" — obviously did not fool themselves; in other words, defendants did not breach a fiduciary duty by failing to disclose to themselves what they already knew.  And plaintiffs did not have the ability to "cause the Plan to purchase Company stock," meaning that there is no causal connection between any misrepresentation *to plaintiffs* and the Plan's acquisition of MoneyGram stock.

The only way in which plaintiffs could have used the information that they claim they were denied would have been to sell their MoneyGram stock at an earlier time.  But plaintiffs did not have the right to trade on the basis of "inside" information — that is, information that had not been disclosed to the market as a whole.  And once MoneyGram disclosed the information to plaintiffs and the rest of the market, the stock price would have dropped, and plaintiffs would have suffered the same damages.

Some courts have dismissed misrepresentation and failure-to-disclose claims on this basis, *see Edgar*, 503 F.3d at 350, and this Court is tempted to follow suit.  But plaintiffs argue that they should have the chance to conduct discovery and obtain an expert analysis to show how a full and timely disclosure would have affected the Plan.  The Court recognizes that this matter is before it on a Rule 12(b)(6) motion — which, again, tests the sufficiency of allegations, not proof.  The Court will be in a better position to assess plaintiffs' arguments after the development of the record.  The Court will therefore deny MoneyGram's motion to dismiss to the extent that it is based on the argument that plaintiffs cannot prove causation.  Needless to say, though, MoneyGram is free to renew its argument on motion for summary judgment.

### d.  Failure to Disclose

Finally, MoneyGram argues that, whatever its obligation to ensure that its communications with Plan participants are truthful and accurate, it has no affirmative obligation to disclose information about the company's investment portfolio or any other adverse business developments that may affect the price of MoneyGram stock.  It is not clear to what extent the Court needs to address this argument.  Plaintiffs do not appear to be making a pure failure-to-disclose claim — that is, a claim that defendants breached the duty of loyalty by failing to disclose information that was not necessary to correct earlier misleading disclosures.  And a pure failure-to-disclose claim would likely be unsuccessful, although Eighth Circuit case law is far from clear on the issue.

The Eighth Circuit has interpreted the duty of loyalty quite broadly.  In *Shea*, the Eighth Circuit noted that, although the Supreme Court's decision in *Varity* declined to reach the issue of whether ERISA fiduciaries ever have an affirmative duty to disclose, *see Varity*, 516 U.S. at 506,

the Eighth Circuit's underlying decision in *Varity* "made clear that the duty of loyalty requires an ERISA fiduciary to communicate any material facts which could adversely affect a plan member's interests." *Shea*, 107 F.3d at 628. The *Shea* court went on to say that "'[t]he duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA.'" *Id.* (quoting *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990)).

At the same time, *Shea* involved an entirely different set of facts — an HMO's failure to disclose that its doctors had a financial incentive to deny care — and this Court would be surprised if the broad language of *Shea* were interpreted to impose a duty of continuous disclosure about corporate developments to employees who participate in an EIAP. In another context, the Eighth Circuit has said that "[e]mployer fiduciaries are not required to provide general business information to potential plan participants . . . ." *Wilson*, 55 F.3d at 406 (rejecting claim that an employer should have disclosed its general business condition to plaintiffs, who could then have assessed whether another, more favorable severance package might be offered at a later date).

At a minimum, however, it is clear that a fiduciary has an affirmative duty to disclose when the fiduciary has reason to know that an earlier disclosure was misleading. *See Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007) ("a fiduciary . . . cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits"). Plaintiffs have alleged just such misleading misrepresentations, *see, e.g.*, Am. Compl. ¶¶ 46, 84, 93-95, and thus their allegations are sufficient to withstand a Rule 12(b)(6) motion.

4.   Count III

A fiduciary who has the power to appoint other fiduciaries has a duty to monitor the

performance of his appointees.  *See Pedraza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1277

(N.D. Ga. 2006) (citing 29 C.F.R. § 2509.75-8).  In Count III, plaintiffs allege that MoneyGram,

and all the individual defendants, had such power and a corresponding duty to monitor their

appointees (which are alleged to include each other as well as the trustee).  According to

plaintiffs, the duty to monitor other fiduciaries includes the duty to give them information

necessary for them to carry out their fiduciary functions.  Plaintiffs allege that MoneyGram

breached this duty by failing to ensure that their appointees were given adequate information

about MoneyGram's high-risk investment portfolio.  Essentially, this claim mirrors plaintiffs'

nondisclosure claim, except that the persons to whom plaintiffs allege the disclosures should

have been made are the appointed fiduciaries rather than plaintiffs and other members of the

putative class.

MoneyGram first argues that this claim should be dismissed because there can be no

liability for failure to monitor without an underlying breach of fiduciary duty by the appointed

fiduciary.  But the Court has held that plaintiffs have pleaded viable claims for breach of

fiduciary duty against the appointed fiduciaries, and thus the Court cannot dismiss the monitoring

claim on this basis.

MoneyGram also argues that, because there is no affirmative duty to notify Plan

participants about adverse business developments, there can be no duty to inform appointed

fiduciaries about them either.  But as discussed above, there is a duty to disclose information to

participants when the fiduciary knows or has reason to know that its earlier disclosures were

misleading. MoneyGram does not explain why, if such a duty exists as to participants, it would not also exist as to appointed fiduciaries.

The Court will therefore deny MoneyGram's motion to dismiss Count III. To be clear, the Court is not adopting plaintiffs' conception of the scope of the duty to monitor. Indeed, the Court has its doubts about plaintiffs' theory. At this point, the Court holds merely that the reasons advanced by MoneyGram do not justify dismissal of Count III.

### 5.  Count IV

In Count IV, plaintiffs allege that MoneyGram breached the duty of loyalty by failing to engage independent fiduciaries who could make independent judgments about the Plan's investment in MoneyGram stock; failing to notify appropriate federal agencies, including the SEC, of the facts that made MoneyGram stock an unsuitable investment; failing to take other "necessary" steps to ensure that participants' interests were loyally and prudently served; and placing its own interests above those of the participants. Plaintiffs also make passing reference to the November 2007 offer from Euronet Worldwide, Inc. to purchase MoneyGram, and to the fact that certain defendants sold MoneyGram stock during the class period.

The Court agrees with MoneyGram that these allegations do not state a claim for relief under ERISA. ERISA fiduciaries are permitted to have interests adverse to those of plan participants. *See Pegram*, 530 U.S. at 225. As a general matter, the fact that a fiduciary's interests were adverse to those of plan participants may be relevant in determining whether the fiduciary acted prudently under the circumstances. *See Moench*, 62 F.3d at 572 ("the more uncertain the loyalties of the fiduciary, the less discretion it has to act"). But the mere fact that a

fiduciary had an adverse interest does not by itself state a claim for relief. *DiFelice*, 497 F.3d at 421.

The remainder of plaintiffs' allegations in Count IV seek to hold defendants accountable for non-fiduciary acts. The Court again reminds plaintiffs that this is an ERISA action, not a securities-fraud action. The Court has already rejected the argument that filing a disclosure with the SEC is a fiduciary act. Similarly, a corporate officer's sale of company stock is not the act of an ERISA fiduciary, as such a sale has nothing to do with the management or administration of the Plan or its assets. *See* § 1002(21)(A). Finally, the allegation that MoneyGram refused a favorable purchase offer likewise does not state a claim under ERISA. Whether to merge with another company is a corporate decision, not a fiduciary one. *Kalda*, 481 F.3d at 646 (company's alleged failure to adequately consider merger did not state a claim for breach of fiduciary duty). The Court will therefore grant MoneyGram's motion to dismiss Count IV.

### 6. Remaining Claims

MoneyGram's only argument with respect to Counts V and VI is that, absent an underlying breach of fiduciary duty, co-fiduciary liability does not exist. MoneyGram is correct, but, as discussed above, plaintiffs have pleaded viable claims for breach of fiduciary duty, and therefore they have pleaded viable claims for co-fiduciary liability.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.    Defendants' motion to dismiss [Docket No. 5] is GRANTED IN PART and
      DENIED IN PART.

2.      Defendants' motion is GRANTED with respect to Count IV of plaintiffs'

amended complaint [Docket No. 11], and Count IV is DISMISSED WITH

PREJUDICE AND ON THE MERITS.

3.      Defendants' motion is DENIED in all other respects.


Dated: March 25, 2009                          s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge